## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **FREDA STEWART,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **7:14-CV-898-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On March 16, 2011, the claimant, Freda Stewart, filed a Title II application for a period of disability and disability insurance benefits. (R. 176-180). The following day, she filed a Title XVI application for Social Security Supplemental Income (SSI). (R. 180-185). In both applications, the claimant alleged disability beginning February 1, 2009 because of high blood pressure, leg and back pain, arthritis, and high cholesterol. The claims were denied initially on June 3, 2011. (R. 91, 97). On July 12, 2012, the claimant amended her alleged onset date to July 22, 2010. (R. 260). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on August 3, 2012. (R. 21).

In a decision dated November 1, 2012, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, therefore, was ineligible for supplemental social security income. (R. 21). On March 14, 2014, the Appeals Council denied the claimant's request

for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

(1) whether the ALJ correctly found that the claimant's osteoarthritis was not a medically determinable impairment;

(2) whether the ALJ correctly found that the claimant's physical impairments were not severe; and

(3) whether substantial evidence supports the ALJ's determination that claimant has the residual functional capacity to perform a full range of work at all exertional levels but with certain nonexertional limitations.[1]

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions,

---

[1]Contrary to the Government's argument, the claimant did sufficiently raise this issue in her brief.

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

3

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months..." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R.§§ 404.1520, 416.920.

Claimant bears the burden of proving she is disabled within the meaning of the Social Security Act. 42 U.S.C. § 432(d)(5)(A). No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless medical signs and laboratory findings demonstrate the existence of a medically determinable physical or mental impairment. *Edwards v. Sullivan*, 937 F.2d 580, 585 (11th Cir. 1991). A medically determinable physical or mental impairment is an impairment that results in anatomical, physiological, or psychological abnormalities that medically acceptable clinical and laboratory diagnostic techniques can prove. 20 C.F.R. § 416.908.

Under step two of the sequential process, the ALJ must determine whether a claimant has a "severe" impairment or combination of impairments that causes more than a minimal limitation on a claimant's ability to function. *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993). When a claimant has alleged several impairments, the ALJ has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991). The claimant bears the burden at the second step of the sequential evaluation of proving that she has a severe impairment or combination of impairments. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  The Eleventh Circuit has determined that "an impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

Before reaching step four of the sequential evaluation process, the ALJ must first determine the claimant's residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). Social Security Ruling 96–8p states:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  The ALJ must first assess the claimant's functional limitations and restrictions and then express his functional limitations in terms of exertional levels. See *Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir.2009); *Freeman v. Barnhart*, 220 F. App'x 957, 959–60 (11th Cir.2007); see also *Bailey v. Astrue*,

5:11–CV–3583–LSC, 2013 WL 531075 (N.D.Ala. Feb. 11, 2013).

The ALJ must consider all of the relevant evidence in assessing the claimant's functional limitations, including

> medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available.

SSR 96–8p at 4-5.

## V. FACTS

The claimant was fifty-eight years old at the time of the ALJ's decision. (R. 21). She has a seventh-grade education, and she stopped attending school after the seventh grade because of her pregnancy. Her past work experience includes employment as a kitchen helper and as a housekeeper. (R. 214). The claimant originally alleged that she was unable to work because of her hypertension, high cholesterol, arthritis, and pain in her back and legs. (R. 206). At the hearing, the claimant testified that she is unable to work due to a painful right hip, asthma, and occasional left arm pain. The claimant stated that her hip pain was the most significant medical problem that prevented her from being able to work. (R. 47-52).

### *Physical Limitations*

From 2001 to 2012, the claimant regularly visited Whatley Health Center ("Whatley") for treatment of her impairments. (R. 298-428). The claimant has received treatment for asthma and hypertension from Whatley since at least 2001. (R. 301). On February 13, 2003, Dr. Rafael

Contreras from Whatley diagnosed the claimant with high cholesterol. (R. 316). Dr. Contreras prescribed medications to the claimant for her impairments and, by the end of 2003, the medications controlled her hypertension, asthma, and cholesterol. (R. 327).

On January 11, 2005, the claimant reported to Dr. Ebony Pratt from Whatley that she was experiencing pain in her shoulders. Dr. Pratt assessed the claimant with bilateral shoulder pain that was "probably secondary to osteoarthritis." Dr. Pratt prescribed Naprosyn for ten days, and thereafter as needed. (R. 349).

The claimant had no significant complaints over the next four years, and her hypertension, asthma, and high cholesterol remained controlled. (R. 350-390). When the claimant visited Whatley on March 17, 2009, the claimant reported to Lesia Means, a physician assistant at Whatley, that she was compliant with her medications and that she was fairly active and able to take care of all of her activities of daily living. (R. 391). On March 11, 2010, Ms. Means diagnosed the claimant with gastroesophaegal reflux disease (GERD) and prescribed medications. (R. 407). Over the next few months, the claimant reported no significant complaints and her conditions remained controlled with her medications. (R. 408-409).

On July 22, 2010, the claimant reported to Ms. Means that she had been having headaches that were lasting two to three days as well as pain below her right knee. The claimant reported no other significant problems. Ms. Means decreased the claimant's blood pressure medication to see if it would reduce her headaches, and the doctor recommended that the claimant soak her leg in water twice daily to see if it would reduce her leg pain. (R. 411-412).

The claimant still reported leg pain when she returned to Ms. Means on December 9, 2010, and Ms. Means assessed the claimant's pain as myalgias secondary to her cholesterol

medication. Ms. Means advised the claimant to stop taking her cholesterol medication to determine if her leg pain was related to her medications. (R. 420). When the claimant returned on January 20, 2011, she reported to Ms. Means that her leg pain had improved since she stopped taking the medications. (R. 422).

The claimant had three more visits to Whatley in 2011, and she reported no complaints and her current impairments remained controlled with medication. (R. 423-428).

At the request of the state agency, on April 16, 2011, Dr. Chima Ukachi performed a consultative medical examination of the claimant. The claimant informed Dr. Ukachi that she had non-radiating pain in her hip and shoulders and that aspirin controlled the pain. She also reported chest pain that Dr. Ukachi stated was consistent with GERD. The claimant had a normal gait, no difficulty getting on and off the exam table or up and out of the chair, and had normal grip and motor strength. Dr. Ukachi also reported that the claimant had a full range of motion of all of her extremities and joints. His impression was osteoarthritis, and stated that the claimant "did not have any functional limitations nor did she have any limitations in her joint movement." (R. 270-272).  Consultative x-rays of the claimant's left wrist taken on April 18, 2011 showed a healed fracture versus a developmental variation of her ulnar styloid, along with mild arthritic changes at the base of her thumb. (R. 274).

On June 2, 2011, Dr. Robert Heilpern, the state agency consulting physician, produced a physical summary of the claimant's limitations. Although Dr. Heilpern did not examine the claimant, his report referenced the claimant's statements that she had difficulties with standing, walking, using hands, and difficulty breathing. He reported that the claimant does not take prescribed medication for pain in the knees, back, and wrist, and that medical evidence shows

healed and mild arthritic joint changes. Dr. Heilpern concluded that the medical objectives do not fully support the claimant's allegations. (R. 279).

During her three visits to Whatley Heath Center between January and July 2012, the claimant did not make any significant physical complaints and she reported that she was doing well. (R. 440-442).

*Mental Limitations*

The claimant did not allege any mental impairments, but at the request of the state agency, Dr. Jerry Gragg performed a consultative psychological evaluation of the claimant on May 23, 2011. At the evaluation, Dr. Gragg did not note any impairment in her memory functioning or thought processes. When asked about her mood, the claimant told Dr. Gragg it was "kinda great." Without the benefit of formal testing, Dr. Gragg's diagnostic impression was borderline intellectual functioning. He stated that the claimant seemed able to respond appropriately to supervision, had adequate social skills to relate to others, and if she were placed in a work setting, she should be able to handle work-related stressors effectively. While he stated that the claimant appeared best suited for jobs that are repetitive in nature and not too challenging, Dr. Gragg summarized that the claimant did not appear to have any intellectual, psychological, or psychiatric issues that would interfere with her ability to function adequately in a work environment. (R. 276-278).

On June 3, 2011, the state-agency consulting psychiatrist, Dr. Robert Estock, completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Form. Although he did not examine the claimant, he affirmed Dr. Gragg's report by stating that the claimant has borderline intellectual functioning. Furthermore, Dr. Estock assessed that the claimant faces mild

degrees of limitation when completing daily living activities and maintaining social functioning, as well as moderate degrees of limitation in maintaining concentration, persistence, or pace and responding appropriately to changes in the work setting. (R. 280-281, 290-292).

At the request of her attorney, Dr. John Goff performed an independent psychological evaluation of the claimant on February 24, 2012. Dr. Goff noted that the claimant was not alleging any particular psychiatric issues. He administered the Wechsler Adult Intelligence Scale-IV to the claimant, and she obtained a verbal comprehension score of 61, a perceptual reasoning index of 79, a working memory index of 71, a processing speed index of 84, and a full-scale IQ of 69–scores that, according to Dr. Goff, fell in the upper end of the mildly retarded range of intelligence. Dr. Goff diagnosed the claimant with a reading disorder and mild mental retardation. He reasoned that the claimant would have difficulty with complex instructions, was unable to deal with any written instructions, and that she would be seen as slow and preoccupied by supervisors, co-workers, and others. Furthermore, Dr. Goff classified the claimant as marked at maintaining attention and concentration for long periods of time, and stated that the claimant should not be expected to maintain regular attendance or be punctual for her job. However, Dr. Goff stated that the claimant could understand, follow, and carry out simple instructions. (R. 429-434).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 75, 79-81). At the hearing, the claimant testified that she is unable to work because of a painful right hip, asthma, and occasional left arm pain. The claimant testified that her hip pain prevents her from being able to

stand up for more than an hour and from sitting down for long periods of time. She classified the hip pain as a nine out of ten and testified to continuous intensity for about a year. (R. 48-50).

 She testified that she could do housework for about an hour, after which she would sit down for a few minutes, and get up and do more work. The claimant indicated that the heaviest thing she can lift is a vacuum cleaner because of the pain in her left arm. She testified that her arm pain started when she was working at the hotel and has lasted about three years. She stated that her asthma is still a problem when dust and other chemicals aggravate her condition, and she is currently unable to afford an inhaler. The claimant said that she takes medicine to control her high blood pressure and headaches, and to help her sleep. She emphasized that she has leg pain about twice a week and that taking Advil helps ease the pain. (R. 50-54).

The claimant testified that she babysat her grandchildren about six times a month for the past couple of years, stating that she plays hide-and-seek with her granddaughter and that she cooks for her grandchildren. She indicated that she is able to take care of herself and that she does her own shopping and cooking. The claimant mentioned that she has two "bad days" a week, where the leg pain prevents her from moving around. (R. 42-44, 60).

A vocational expert, Ms. Stricklin, testified concerning the type and availability of jobs that the claimant was able to perform. She classified the claimant's past job as a kitchen helper as "medium and unskilled in nature," and her past job as a housekeeper as "light and unskilled." The ALJ asked Ms. Stricklin to assume a hypothetical person who was the claimant's age, education, and work experience, with the following limitations: could remember and understand to do simple tasks and not detailed or complex tasks; could maintain attention and concentration for two hours at a time to complete a forty hour work week; could respond to gradual infrequent

11

changes in the work setting; could function best with a familiar, repetitive work routine; could

read at the mid-first grade level; and could spell at the beginning of the second-grade level. The

ALJ asked Ms. Stricklin whether, if the ALJ found these limitations credible, the claimant would

be able to return to any of her past work. Ms. Stricklin responded that under these constraints, the

claimant could return to both of her past jobs. The ALJ then asked Ms. Stricklin whether, if the

ALJ finds that the claimant cannot be exposed to concentrated amounts of extreme heat, odors,

dusts, gases, and other asthma irritants, the claimant could still return to her job. Ms. Stricklin

responded that the claimant could return to her past jobs. (R. 68-71).

The ALJ concluded his examination of Ms. Stricklin by asking her to assume that he

finds Dr. Goff's opinion credible–that the claimant is excluded from performing repetitive tasks

and understanding complex instructions; that she is marked at maintaining attention and

concentration for long periods of time; and that she would not be expected to maintain regular

attendance or be punctual. The ALJ asked Ms. Stricklin if this assumption would interfere with

the claimant's ability to perform recurrent or past work, and Ms. Stricklin responded that such

limitations would interfere with the claimant's ability to perform recurrent or past work, as well

as all jobs in the local or national economy. (R. 71).

The claimant's attorney then examined Ms. Stricklin, asking her if the ALJ accepts the

claimant's testimony that she has two "bad" days a week where she would be unable to go to

work, whether she could perform any job that exists in significant numbers. Ms. Stricklin

responded that the claimant could not. (R. 72).

*The ALJ's Decision*

On November 1, 2012, the ALJ issued a decision finding that the claimant was not

12

disabled under the Social Security Act. (R. 21). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2013, and had not engaged in substantial gainful activity since her amended alleged onset of July 22, 2010.

Next, the ALJ found that the claimant had a severe impairment of borderline intellectual functioning. The ALJ further noted that the claimant's severe impairment of borderline intellectual functioning and non-severe impairments of asthma, hypertension, high cholesterol, GERD,  and knee, hip, and shoulder pain did not, singly or in combination, meet or medically equal the severity of a listed impairment. Although the medical records gave some indication that the claimant could possibly have osteoarthritis, the ALJ ruled that this indication was not medically determinable and that no lab results or results from other medical tests confirmed this suggestion. (R. 24).

After considering the entire record, the ALJ found that the claimant has the residual functional capacity to perform a "full range of work at all exertional levels" with the following limitations: she can have no concentrated exposure to extreme heat, odors, dust, gases, or other asthma irritants; she can remember, understand, and do simple tasks, but not detailed or complex tasks; she can maintain attention and concentrate for two hours at a time to complete a 40-hour workweek, she can respond to gradual, infrequent changes in the work setting; she would function best with a familiar, repetitive work routine; and she reads at the mid-first grade level and spells at the beginning of the second grade level. (R. 26).

The ALJ considered medical and opinion evidence, as well as the claimant's testimony, to determine the claimant's RFC. The ALJ emphasized the claimant's mental limitations as supported by evidence in the record. However, the ALJ found that, although the claimant's

medically determinable physical impairments could "reasonably be expected to cause the alleged symptoms," the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the objective medical evidence in the record. (R. 25).

To support his conclusion, the ALJ listed the claimant's medical history with Whatley Health Center and referenced the findings of the claimant's two consulting physicians: Dr. Ukachi and Dr. Heilpern. The ALJ concluded that Dr. Ukachi's findings, based on direct observation and examination of the claimant, are internally consistent "as well as consistent with the evidence as a whole"; specifically, her treatment records show that the claimant had not made any significant complaints to her treating medical sources and that her impairments are "well controlled" with her medications.

The ALJ further held that the claimant's own report and testimony to Dr. Ukachi of her daily living activities suggest a greater sustained capacity than described by the claimant during the hearing. The ALJ provided examples from the record, such as the claimant's report to Dr. Ukachi that she is able to stand for one hour at a time, cook, wash the dishes, vacuum, and walk on level ground for an hour at a time. The ALJ found this report consistent with the claimant's medical records, which showed that, while she made some occasional complaints regarding headaches and knee, leg and shoulder pain, those complaints were intermittent. Furthermore, the claimant reported that her pain improved overall from either a change in medications or the use of over-the-counter aspirin.

The ALJ also found that Dr. Heilpern's opinion evidence was consistent with the evidence as a whole, crediting Dr. Heilpern's careful consideration of the objective medical

14

evidence and the claimant's allegations regarding her symptoms and limitations. The ALJ
concluded that Dr. Ukachi and Dr. Heilpern's findings were objectively determined and
uncontradicted by medical evidence, and thus were entitled to "significant weight." (R. 29-31).

Although Dr. Ukachi did reveal a medical impression of osteoarthritis, the ALJ found that
this impression appears to be "based on the claimant's report," as Dr. Ukachi's physical
examination showed that the claimant did not have any functional limitations nor did she have
any limitations in her joint movement. The ALJ concluded that the claimant's medical records
also do not support a diagnosis of osteoarthritis, as they do not show any limitation or swelling in
her joints. The ALJ found that, notwithstanding the claimant's allegations of pain, discomfort,
and physical limitations, treatment records and examinations do not provide evidence that would
reasonably support a finding that the claimant is as physically limited as she alleges. (R. 30).

The ALJ added nonexertional limitations to the claimant's RFC after considering the
evidence in the record  regarding the claimant's mental limitations. To support his conclusion,
the ALJ first referenced Dr. Gragg's findings and opinions. The ALJ explained that Dr. Gragg
questioned the claimant regarding her work history and daily activities, noting that based on her
report and his examination, the claimant did not have any "significant restrictions" in her
activities or interests caused by any psychological or psychiatric issues. In addition, the ALJ
emphasized that when Dr. Gragg asked the claimant about why she was currently not working,
she answered that she was unable to find a job–not because of her inability to work. The ALJ
found that Dr. Gragg's opinion that the claimant could handle her finances and understand,
remember, and carry out instructions is consistent with her work history as a housekeeper and
kitchen helper. The ALJ concluded that Dr. Gragg's findings carry significant weight, as his

15

findings and opinion are consistent with the claimant's reported daily activities and her work history. (R. 28, 31).

The ALJ also referenced Dr. Estock's findings as set out in the Psychiatric Review Technique Form and the Mental Residual Functional Capacity Form; the ALJ noted that although Dr. Estock did not examine the claimant, he provided specific reasons for his opinions that were based on evidence in the claimant's record. The ALJ found that Dr. Estock carefully considered the objective medical evidence and the claimant's allegations regarding symptoms and limitations. The ALJ noted that Dr. Estock's findings were internally consistent as well as consistent with the evidence as a whole, showing that the claimant has some intellectual limitations and that her work history consisted of unskilled work that would not require her to read or perform math. The ALJ concluded that, because Dr. Estock's findings are well supported by evidence in the record, they also carry significant weight. (R. 31).

Although the ALJ considered Dr. Goff's findings, he concluded that Dr. Goff's findings carried little weight. The ALJ referenced Dr. Goff's administration of several diagnostic tests to the claimant, explaining that Dr. Goff did not ask the claimant any questions regarding her activities. Furthermore, the ALJ noted that the claimant's activities testified to and reported by the claimant are inconsistent with a diagnosis of mild mental retardation. Because the ALJ found that Dr. Goff's opinion and findings are inconsistent with the claimant's daily activities and work history, these findings had little weight. (R. 30).

After assessing the claimant's RFC, the ALJ found that the claimant was able to perform past relevant work as a kitchen helper, which is classified as medium and unskilled, and as a housekeeper, which is classified as light and unskilled. The ALJ explained that the claimant

16

performed these jobs within the past fifteen years at an earnings level exceeding significant

gainful activity, and did so for a sufficient period of time to have fully learned the duties required

by those jobs. Noting the testimony of the vocational expert, the ALJ found that in comparing the

claimant's RFC with the physical and mental demands of this work, the claimant could perform

her past relevant work. (R. 31-32). Thus, the ALJ concluded that the claimant was not disabled as

defined under the Social Security Act. (R. 32).

## VI. DISCUSSION

The claimant argues that the ALJ incorrectly classified the claimant's alleged

osteoarthritis as not medically determinable, that the ALJ incorrectly determined that the

claimant's physical impairments were non-severe, and that the ALJ's RFC findings are not based

on substantial evidence. To the contrary, this court finds that the ALJ correctly classified the

osteoarthritis as non-medically determinable, and the claimant's physical impairments as non-

severe, and that substantial evidence supports the ALJ's RFC findings..

**I. The ALJ correctly classified the claimant's alleged osteoarthritis as not medically
determinable.**

The claimant argues that the ALJ erred by finding that osteoarthritis was not a medically

determinable impairment. This court disagrees and finds that the ALJ properly classified the

claimant's alleged osteoarthritis.

A symptom or combination of symptoms cannot be the basis for finding a disability

unless medical signs and laboratory findings demonstrate the existence of a medically

determinable impairment. *Edwards v. Sullivan*, 937 F.2d 580, 585 (11th Cir. 1991). A "medically

determinable" physical or mental impairment results in physical or mental abnormalities that

medically acceptable diagnostic techniques can prove. 20 C.F.R. § 416.908. The claimant has the burden to prove that she has a medically determinable impairment. 42 C.F.R. § 423(5)(A).

The ALJ recognized that the medical records indicated that the claimant "could possibly have osteoarthritis." However, the ALJ further explained that the medical record contained no definitive diagnosis of osteoarthritis from any doctor at Whatley Health Center, Dr. Ukachi, or Dr. Heilpern, and no lab results or results from diagnostic tests confirm such a diagnosis. Furthermore, the ALJ explained that the medical records, taken as a whole, show no limitation or swelling in the claimant's joints. (R. 26). In the absence of objective medical evidence, the ALJ correctly found that the existence of osteoarthritis was not medically determinable.

The claimant argues that the Social Security Administration's own consultative physician, Dr. Ukachi, recorded osteoarthritis as his single diagnostic impression when he examined the patient. However, a diagnosis, without more, is no indication that the impairment is medically determinable. *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987). Furthermore, the claimant argues that Dr. Pratt at Whatley Health Canter assessed her bilateral shoulder pain as "probably secondary" to osteoarthritis, suggesting that the shoulder pain–rather than the osteoarthritis–is the probable factor. However, the ALJ explained that this assessment of osteoarthritis is also not based in any medical testing or laboratory work. (R. 30). Absent a diagnosis based in medical evidence, this possibility of osteoarthritis remains a mere possibility and non-medically determinable.

The claimant failed to meet her burden of proof that osteoarthritis is a medically determinable impairment for her case. The court finds that substantial evidence supports the ALJ's determination that the claimant's alleged osteoarthritis was non-medically determinable.

18

Consequently, the ALJ correctly classified that impairment.

**II. The ALJ correctly determined that the claimant's physical impairments were not severe.**

The claimant argues that the ALJ erred in determining that her physical impairments were not severe. The court finds that the ALJ properly stated his reasons for determining the impairments were not severe impairments and that substantial evidence supports his decision.

The ALJ has a duty to consider the claimant's alleged severe impairments in combination and to determine whether the combined impairments render the claimant disabled. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991). The claimant bears the burden  of proving that her impairment is severe. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  An impairment is not severe if it does not "significantly limit [the claimant's] physical or mental ability to do basic work activities." *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

The ALJ supported his decision that the claimant's impairments were not severe. The ALJ concluded that the claimant's medically determinable physical impairments consisted of hypertension, high cholesterol, GERD, and leg, knee and shoulder pain. He also found, at step two, that the claimant's physical  impairments, either singly or in combination, were not severe.[2]

In discussing the severity of the claimant's physical limitations, the ALJ explicitly referenced Dr. Ukachi's record from his examination of the claimant, giving the record

---

[2]By finding in the claimant's favor at step two and finding she did have a severe mental impairment and proceeding to the next step of the sequential evaluation process, the ALJ did all he was required to do at step two. *See Heatly v. Comm'r of Soc. Sec.,* 328 F. App'x 823, 824-825 (11th Cir. 2010)

significant weight in his analysis.[3] The ALJ emphasized that, although the claimant had complained of right hip and bilateral shoulder pain for more than a year, the claimant informed Dr. Ukachi that her pain was controlled with medication. The ALJ explained that the claimant did not indicate that her pain affected her ability to work; to the contrary, the ALJ referenced the claimant's self-described abilities to vacuum, cook, do the dishes, stand up and walk for about an hour, and play hide-and-seek with her grandchildren. Furthermore, the ALJ referred to Dr. Ukachi's findings that the claimant had a normal gait, had a 5/5 bilateral grip strength, and a "full range of motion in all joints." (R. 29). Finally, the ALJ emphasized Dr. Ukachi's findings that the claimant did not have any limitations in functional areas and the claimant had "no demonstrable limitations" in joint movement.

Also, as the ALJ discussed, Whatley Health Center treated many of the claimant's physical impairments, and these medical records report that the claimant has controlled these impairments with medication. The ALJ emphasizes that the claimant has had no significant complaints or problems reported to Whatley Health Center since July 2010. The claimant made no indication that her physical impairments prevent her from working; rather, the ALJ explained that, during her psychological evaluation with Dr. Gragg, the claimant told him that she was laid off in 2009 and she had not worked since that time because she could not find a job. (R. 30). She did not tell him that she had not worked because of medical reasons. Because the claimant failed to prove that her physical limitations impacted her ability to perform basic work functions, the

---

[3]When determining the weight to give a doctor's opinion, an ALJ considers numerous factors, including whether the doctor examined the claimant, whether the doctor treated the claimant, the evidence the doctor presents to support his or her opinion, and whether the doctor's opinion is consistent with the record as a whole. *See* 20 C.F.R. 404.1527(c), 416.927(c).

ALJ correctly determined that these physical impairments were not severe.

**III. The ALJ's RFC determination is supported by substantial evidence.**

The claimant argues that the ALJ's RFC assessment was incorrect where the ALJ found the claimant was capable of performing a full range of work at "all exertional levels" with several non-exertional limitations. The claimant claims that a "sedentary" exertional level would be more appropriate.  However, this court finds that ALJ did not err because substantial evidence supports his RFC assessment.

The residual functional capacity assesses a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a)**.** In determining an individual's RFC, the ALJ must consider all symptoms and the extent to which these symptoms are reasonably consistent with the objective medical evidence and opinion evidence. 20 C.F.R. §404.1520(e).

At the hearing, the claimant testified that she is unable to work because of a painful right hip, asthma, and occasional left arm pain. She said she could only stand for about an hour, that her hip pain is a "nine out of ten" in severity and can last for as long as an hour or two, and her asthma causes her to experience shortness of breath when it gets cloudy or when she dusts. The ALJ concluded that the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible. The ALJ explicitly referenced the claimant's medical history to show the inconsistency between the medical evidence and her own statements. (R. 26).

First, he referenced the claimant's visits to the Whatley Health Center over the past thirteen years. The ALJ noted that although the claimant has been receiving treatment for asthma and hypertension since 2001 and was diagnosed with high cholesterol in 2003, the claimant has controlled these impairments with medication. Furthermore, the ALJ reasoned that although the

claimant began experiencing pain in her leg and shoulder and was diagnosed with GERD, the claimant also controlled these impairments with medication and she reported to her treating physician that "she was fairly active and able to take care of all her activities of daily living." The claimant never indicated that these impairments impacted her ability to work throughout her thirteen years of appointments at the Whatley Health Center.  (R. 27-28).

Next, the ALJ considered Dr. Ukachi's consultative medical examination of the claimant. The ALJ recognized that Dr. Ukachi found that the claimant had a normal gait, had no difficulty getting on and off the exam table or up and out of the chair, and normal motor and grip strength. In addition, Dr. Ukachi found that the claimant had a full range of motion of all of her extremities and joints. The ALJ reasoned that Dr. Ukachi's opinion supported the Whatley Health Center's finding that the claimant managed her physical impairments, further highlighting the inconsistency between the medical evidence and the claimant's testimony.

The claimant contends that the ALJ's RFC determination is "unrealistic", arguing that a sedentary RFC would better comport with the alleged reduced level of stamina from the claimant's combined severe and non-severe impairments. However, the claimant has the burden to prove that her impairments create this reduced level of stamina that prevents her from working. *See Macia v. Bowen*, 829 F .2d 1009, 1012 (11th Cir.1987) (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir.1985)).

The claimant failed to point to any medical evidence in her record that demonstrates that she cannot do her past work, much less any work at all. The ALJ emphasized that the record of the claimant's course of treatment for her impairments, opinion evidence, the claimant's own report and testimony of her activities of daily living, and the medical treatment records all show

"a greater capacity than described by the claimant." (R. 30).

The claimant also argues that the ALJ's RFC determination is not comprehensive or specific enough to meet the RFC's requirement of a function-by-function analysis. Initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. This RFC assessment is first used for a function-by-function comparison with the functional demands of an individual's past relevant work as he or she actually performed it and then, if necessary, as the work is generally performed in the national economy. SSR 96-8p.  During the hearing, the ALJ asked the vocational expert whether an individual with the claimant's age, education, work experience, and RFC would be able to perform functions from the claimant's past relevant work as a kitchen helper and as a housekeeper. The ALJ also included the nonexertional limitations of the claimant's RFC in this hypothetical. The vocational expert responded that such an individual "would be able to perform such work as the claimant actually performed it and as generally performed." (R. 70).

For a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir.2011). Because the ALJ's hypothetical to the vocational expert comprised the limitations that he added to the claimant's RFC, Ms. Stricklin's testimony supports the ALJ's conclusion that the claimant can complete her past relevant work. In addition, because the ALJ concluded that the claimant can complete her past relevant work, the sequential evaluation stops at this point and no further function-by-function analysis is required.

The claimant also contends that the ALJ's application of the Medical Vocational Rules (MVR), allowing for the full range of work without "any additional limitations," failed to

consider possible postural or environmental restrictions that may apply. This claim lacks merit, as the ALJ did not use the MVR when assessing the claimant's RFC. In addition, the ALJ carefully considered the claimant's alleged limitations when determining her RFC and actually added limitations to her RFC.

Although the claimant's RFC does allow for a full range of work at all exertional levels, the ALJ lists several nonexertional limitations that apply to her RFC. The first limitation–the claimant can have no concentrated exposure to extreme heat, odors, dust, gases, or other asthma irritants–is an environmental limitation that considers the claimant's limitations from her asthma. The remaining limitations come from the ALJ's consideration of the claimant's medical evidence of her mental limitations. (R. 27-30).  In weighing the evidence provided, the ALJ determined that the claimant had a severe and medically determinable impairment, listed as borderline intellectual functioning, and the ALJ integrated the claimant's mental restrictions resulting from her impairment into the limitations for her RFC.

The claimant specifically mentions the ALJ's failure to consider osteoarthritis when determining the claimant's RFC. However, when assessing an individual's RFC, the ALJ must consider only limitations and restrictions attributable to medically determinable impairments. SSR 96-4. Because medical evidence does not support the claimant's alleged diagnosis of osteoarthritis and has thus been declared a non-medically determinable impairment, the ALJ need not consider osteoarthritis in the claimant's RFC determination.

The ALJ properly applied the law in making his RFC assessment. The ALJ is required to consider all of the relevant evidence. SSR 96–8p. In reaching his conclusion, the ALJ considered the medical evidence in the treatment records; the claimant's self assessment of her daily

activities; the claimant's testimony; and the consulting physicians' opinions. Ultimately, the ALJ discredited the claimant's testimony, but, as the court explained above, this record substantially supported this decision. Therefore, the ALJ did consider all of the relevant evidence. By considering all of the evidence, the ALJ properly applied the law.

The ALJ found that the evidence on record was sufficient to enable him to make a determination about the claimant's RFC. This court finds that substantial evidence supports the ALJ's determination of the claimant's RFC.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 9th day of June, 2015.



KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE